# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MUHANNAD M. SALIM,

                    Plaintiff,

v.

SHERIFF ROBERT CARLSON,
C.O. LATHAM, C.O. EMPER,
NICK KOLDEWAY, SGT. GONZALES,
WILLIAM BROWN, DEPUTY BRAD
ALLEN, SGT. KELLEN SCHRETT,
C.O. JACOBSON, DOUGLAS WEARING,
ANDREW ELLENBERGER, and
JUAN RAMOS,

                    Defendants.

Case No. 11-CV-1118-JPS

**ORDER**

Plaintiff Muhannad M. Salim ("Salim"), a state prisoner currently incarcerated at the Columbia Correctional Institution, filed a lawsuit alleging that he was deprived of several Constitutional rights while he was a pretrial detainee at the Racine County Jail ("Jail"). (Docket #1). He named as defendants several employees of the Jail. In a screening order dated July 18, 2012, this court permitted Salim to proceed on nine separate claims. (Docket #15). Briefly stated, those claims are: (1) a due process claim for placing him in segregation without a hearing; (2) a conditions of confinement claim due to alleged deprivation of recreation; (3) a claim of cruel and unusual punishment arising out of an incident on September 21, 2010 ("the September 21 incident"); (4) a claim for failure to provide medical attention following the September 21 incident; (5) claims of unconstitutional conditions of confinement due to allegedly unhygienic conditions; (6) a claim of unconstitutional conditions of confinement due to water allegedly being cut off to his cell; (7) a claim that members of the Correctional Emergency

Response Team ("CERT") team confiscated the plaintiff's property; (8) a claim for failure to provide medical care following officials' alleged use of chemical spray; and (9) a First Amendment free exercise claim.

Now before the court is the defendants' motion for summary judgment. (Docket #49). Having concluded that the defendants are entitled to summary judgment on some, but not all, of Salim's claims, the court addresses each claim below.

1.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

2.    Facts[1]

Salim was booked into the Jail on July 3, 2010, on multiple felony counts. Salim was housed at the Jail from July 3, 2010, until December 2, 2010, except for the following time periods, when he was sent to Milwaukee County Jail: July 7 to July 14, July 21 to July 23, October 11 to October 14, and November 17 to November 19. Salim was a pretrial detainee at all times relevant to this lawsuit.

---

[1]The facts are taken from the parties' proposed findings of facts, to the extent they are supported by admissible evidence. Where there are disputes of fact, they will be noted.

### 2.1 Administrative Confinement

On August 11, 2010, the Jail received a court order restricting the plaintiff's phone privileges to communications with his attorney. In order to ensure compliance with the order, Jail staff moved the plaintiff from the general population to administrative segregation so that they could monitor and control the plaintiff's phone usage. Inmates in general population are free to use payphones in the dayrooms at will. Technical and staffing limitations prevented Jail staff from real-time monitoring of individual inmate phone usage for inmates housed in general population at the Jail. If Jail staff permitted the plaintiff to remain housed in the general population, they could only ensure the order's enforcement by turning off all phones in the dayroom, which would have deprived phone usage to all other inmates in the same dayroom.

Inmates in administrative segregation at the Jail are only permitted outside their cells for one hour per day. On August 22, 2010, Jail staff observed the plaintiff fighting with another inmate housed in administrative segregation during his hour out of his cell.

On September 10, 2010, mental health staff referred the plaintiff to suicide watch housing/status because he refused to eat. The Jail has formal procedures in the event that an inmate is on suicide watch. In order to comply with the policy, Jail staff temporarily confiscated the plaintiff's personal items. Staff provided the plaintiff with suicide garments and a safety blanket. On September 13, 2010, the plaintiff was removed from suicide watch status.

On September 25, 2010, Captain Douglas Wearing, a defendant in this action, received a request from the plaintiff stating that the court restored his phone privileges and asking to be placed back in the general population.

Captain Wearing checked the Wisconsin Circuit Court Access website and, based on the information he found there, advised the plaintiff that the order had not been revoked and that his next court date was November 1, 2010.

On September 30, 2010, the Jail received noticed that the plaintiff's phone privileges were restored and noted it in their records. However, the plaintiff was not moved back to general population. He was considered a safety and security risk requiring administrative segregation housing due to bad behavior. The plaintiff asserts that the defendants decided to place him on administrative segregation, not for safety or security concerns, but because he proved that his phone restriction was over.

On November 2, 2010, the Racine County Circuit Court entered a new order restricting the plaintiff's telephone privileges, which remained in effect until the plaintiff's release from the Jail on December 2, 2010.

### 2.2    Restrictions on Recreation

The plaintiff avers that he was denied passive and active recreation while he was in administrative segregation. The defendants have submitted evidence showing that Jail policy allows inmates passive and active recreation. With regard to active recreation, inmates are not allowed to engage in weightlifting or similar resistance exercises. However, inmates may engage in active recreation in their living areas. Inmates regularly engage in various physical activities including sit-ups, push-ups, pull-ups, jumping jacks, and running in place. The plaintiff was, at all times during his incarceration at the Jail, permitted to engage in those types of physical activities. The plaintiff states that prisoners in administrative segregation do not have access to a pull up bar and that the cells were so tiny that they prevented him from doing jumping jacks. The plaintiff further avers that he

Case 2:11-cv-01118-JPS   Filed 08/06/13   Page 4 of 23   Document 66

was not allowed to exercise in the dayroom. He says he was only allowed to shower in the dayroom.

The administrative segregation dayrooms in which the plaintiff was housed during his incarceration provided ample space for him to engage in those types of physical exercise. It is common for Jail staff to observe inmates engaging in those types of physical activities, both within and outside their cells in general population and segregation.

The plaintiff's jail records do not reflect that he made any requests concerning his ability to engage in physical exercise. Nor do they reflect that any Jail staff member prohibited the plaintiff from engaging in any physical activity at any time. The plaintiff avers that he was not allowed to engage in any type of exercise in the dayroom.

2.3     The September 21 Incident

The parties dispute the facts of the interaction between the plaintiff and defendant Deputy Andrew Ellenberger ("Ellenberger") on September 21, 2010.

According to Ellenberger, the plaintiff became agitated and aggressive when told he could not use the telephone due to the August 11, 2010 order. The plaintiff placed his right arm through the tray slot in the dayroom door and requested that Ellenberger read a request form concerning his phone privileges. Ellenberger gave the plaintiff multiple direct orders to stand down and remove his arm from the tray slot, but the plaintiff refused to comply. Ellenberger then pushed the plaintiff's arm back through the tray slot into the day room. Ellenberger ordered the plaintiff to return to his cell, but the plaintiff refused. Ellenberger contacted additional officers to escort the plaintiff back to his cell.

Salim disputes that Ellenberger ordered him to stand down multiple times. He asserts that after the plaintiff asked Ellenberger to read his request slip that Ellenberger pushed and slapped the plaintiff in the face, making him jerk his head back and fall down to the floor. The plaintiff also disputes that he was agitated or aggressive. He asserts that he was simply asking why he could not use the phone to call his attorney, which is when Ellenberger got agitated and aggressive and pushed or slapped the plaintiff in the face, making the plaintiff fall down and injure his head and elbow.

Surveillance cameras recorded the September 21, 2010 incident. At approximately five minutes into the video, the plaintiff is seen squatting in front of a door, pushing his arm through the tray slot. At about this same time, the plaintiff is seen falling onto his back side. He does not hit his head. At five minutes and twenty-four seconds, the plaintiff is seen pointing to his elbow. At ten minutes and thirty-eight seconds, the plaintiff is escorted back to his cell.

Ellenberger called for medical assistance and shortly thereafter nurse Jim Olstinske arrived to treat the plaintiff. Nursing notes indicate that the plaintiff complained of light-headedness and dizziness and reported striking his head. The Jail nurse examined the plaintiff and found him to be alert and oriented with apparently normal vital signs.

2.4    Unhygienic Conditions

On October 5, 2010, the plaintiff's neighboring inmate threw feces and toilet paper into the plaintiff's cell. The defendants submit that Jail staff addressed and corrected the condition that same day by issuing the plaintiff new jail items and cleaning his cell. The plaintiff disputes this. He avers that he was told he would get to change into clean clothes but they were never given to him, and that he was flat-out denied clean linens. He also avers that

his cell was not cleaned. On October 6, 2010, plaintiff was moved to a different cell.

2.5    Restricted Water

The defendants submit that on October 3, 2010, the plaintiff filled up baggies and milk cartons with water and encouraged another inmate to throw them through the dayroom and on dayroom windows. The plaintiff avers that he never did that.

The defendants also submit that the plaintiff and a neighboring inmate were throwing bags full of what Jail staff believed to be feces and urine on October 4, 2010. The plaintiff disputes that he did this too. Upon arriving on the scene, defendant Officer Nick Koldeway observed what appeared to be 20-30 sandwich bags filled with unidentifiable liquid. In addition to the bags, there was a large amount of water pooling through the dayroom which was reportedly leaking into the medical offices on the floor below through the ceiling. Koldeway turned off the water to cells 6, 7, and 8—plaintiff was in cell 7—while staff searched each cell and removed containers that could hold liquid to prevent further incidents.

Jail records are not clear, but the October 4, 2010 incident would have resulted in staff temporarily keeping the water turned off in each of the cells to prevent similar incidents. The plaintiff claims the water was off until October 6, 2010. The defendants assert that each inmate in those cells, including the plaintiff, would have been permitted to flush his toilet and take water to drink at least once per day until the water restriction was removed. The plaintiff avers that, while other inmates were allowed to do this, he was not given access to water until October 6, 2010.

On October 6, 2010, the plaintiff was moved from 3B administrative segregation to 4B administrative segregation, where there were no water restrictions in place.

### 2.6     Chemical Spray

On October 4, 2010, the inmate housed in the adjacent cell created a disturbance; in their response to the disturbance, Jail staff ultimately utilized Oleoresin Capsicum Spray ("OC Spray") to restore order. According to the incident reports related to this incident, the plaintiff cooperated and complied with all orders given to him. None of the incident reports reflect that the plaintiff was subject to OC Spray exposure, nor do any of the incident reports indicate that the plaintiff requested medical treatment for such exposure.

The October 4, 2010 incident reports reflect the plaintiff's neighboring inmate received medical treatment subsequent to being subjected to OC Spray and was further permitted to decontaminate. The plaintiff's records do not reflect any requests for medical attention consistent with the symptoms he allegedly suffered in his complaint.

The plaintiff also asserts that he suffered effects of chemical spray exposure on October 24, 2010. The plaintiff's jail records do not reflect an incident on or about October 24, 2010, during which the plaintiff was either directly or indirectly exposed to OC Spray or any other chemical agent. The plaintiff's medical records do not reflect that he requested medical treatment on or about October 24, 2010, related to exposure to OC Spray or any other chemical agent.

### 2.7     Free Exercise

The plaintiff avers that the Jail prohibited him from possessing a Holy Quran in administrative segregation and did not allow him to participate in

Case 2:11-cv-01118-JPS   Filed 08/06/13   Page 8 of 23   Document 66

Jumuah and Talim or the 2010 Ramadan, Eid al-Fitr, and Adha. The plaintiff further avers that he was allowed only a Bible, not a Holy Quran, in administrative segregation.

The Jail does not prohibit inmates from engaging in religious activities. The Jail permits inmates to freely exercise their religion, assuming such free exercise does not create a safety or security risk. Inmates may request that the Jail Chaplain provide them with a holy book such as a Quran. Inmates are also permitted to make other requests which, if reasonable and appropriate from a safety and security standpoint, may be granted.

The plaintiff made requests for the time by pushing his cell intercom button to communicate with staff. He was told that the button was only for emergencies and that the time was not an emergency.

If an inmate needs to know what time it is to follow a prayer schedule, Jail staff will entertain such requests if appropriately made pursuant to the Jail request policy.

Jail policy does not prohibit any inmate from engaging in prayer or other form of worship at any time so long as such conduct does not create a safety and/or security concern within the Jail. Nothing in the plaintiff's jail records reflects his attempts at prayer or other religious worship created a safety or security concern within the Jail. Additionally, according to the defendants, the plaintiff never submitted requests to Jail staff concerning the appropriation of a Quran or any other requests related to the observance of any religious holiday or celebration, including the time of day for the purpose of making Salat.

The plaintiff avers that he wrote to Wearing and Brown at least ten times, but he never got any response. The plaintiff states that he was denied a Holy Quran because he was in administrative segregation and was told that

he can only have a Holy Bible per Jail policy. The Jail deprived him of the chance to worship by depriving him of Jumuah, Talim, a prayer schedule, access to the times so that he would know when to pray, Ramadan, and the Eid al-Fitr and Adha.

3.      Analysis

As previously stated, this court permitted Salim to proceed on nine separate claims. The defendants argue that they are entitled to summary judgment on each of the plaintiff's claims. The remainder of this Order addresses each claim in turn.

3.1      Due Process: Administrative Confinement

The plaintiff submits that his due process rights were violated because he did not receive a hearing before being transferred to administrative segregation. The plaintiff was housed in administrative segregation at the Jail from August 11, 2010, through December 2, 2010, with the exception of four trips to Milwaukee County that each ranged from three to eleven days.

The plaintiff does not dispute that his transfer to administrative segregation on August 11, 2010, was due to a Racine County Circuit Court order limiting his telephone communication to only his attorney. However, the plaintiff suggests that the defendants could have monitored his calls by observing him whenever he was out of his cell, and they could have counseled him that he would be placed in administrative segregation if he attempted to use the phone.

During the relevant time, the plaintiff was a pretrial detainee. "The scope of an individual's right to be free from punishment…hinges in his status within the criminal justice system." *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). Pretrial detainees have not been convicted or sentenced yet and may not be punished by the state in any way. *Id.* "A pretrial detainee

Case 2:11-cv-01118-JPS    Filed 08/06/13    Page 10 of 23    Document 66

cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard." *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002). "But no process is required if he is placed in segregation not as punishment but for managerial reasons." *Id.*

In *Bell v. Wolfish*, the United States Supreme court explained that to establish a right to due process, a pretrial detainee must demonstrate either: (1) an "expressed intent to punish on the part of detention facility officials"; or (2) that the challenged condition or restriction lacked a reasonable relationship to a legitimate, non-punitive administrative purpose. 441 U.S. 520, 538-39 (1979). The plaintiff cannot proceed under the first path; he presented no evidence to contradict the defendants' sworn affidavits that the plaintiff's placement in administrative segregation was nonpunitive and done to comply with the communication restrictions imposed by the Racine County Circuit Court. The plaintiff's claim also fails under the second path. The plaintiff has presented no evidence that his placement was arbitrary. Rather, the evidence in the record shows that the placement was reasonably related to the legitimate, non-punitive administrative purpose of complying with the court order. This court must rely on the defendants' uncontradicted averments that technical and staffing limitations limited the Jail's options for compliance with the court order, requiring that the plaintiff be removed from the general population.

Moreover, "wide-ranging deference" must be given to the decisions of jail administrators. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Prisons are accorded great deference in the areas of internal order and security. *Azeez v. Fairman*, 795 F.2d 1296, 1298 (7th Cir. 1986). This court must defer to the Jail official's determination that they could not monitor or control the plaintiff's telephone usage in the general population.

Although the phone restrictions were lifted on September 30, 2010, the Racine County Circuit Court again imposed the same phone restrictions on the plaintiff on November 2, 2010. The restrictions remained in place until the plaintiff left the Jail on December 2, 2010. For the reasons discussed above, the defendants once again were entitled to place the plaintiff in administrative segregation to comply with the court order.

This leaves the time period between September 30, 2010, and November 2, 2010, when the plaintiff was kept in administrative segregation due to safety and security concerns because of two incidents involving the plaintiff's behavior.

To be entitled to due process, a plaintiff must first show that he has a protected liberty interest. *Domka v. Portage County*, 523 F.3d 776, 779-80 (7th Cir. 2008); *Sandin v. Connor*, 515 U.S. 472 (1995). "A prisoner has no liberty interest in remaining in the general population." *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1995).

> When an inmate is placed in conditions more restrictive than those in the general prison population, whether through protective segregation like suicide watch or discretionary administrative segregation, his liberty is affected only if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time.

*Earl v. Racine County Jail*, __ F.3d __, 2013 WL 2302107, *2 (7th Cir. May 28, 2013) (citations omitted).

In *Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1998), the Seventh Circuit determined that a prison inmate's 70-day confinement in disciplinary segregation was not an "atypical and significant" deprivation of a prisoner's liberty and thus did not implicate liberty interest protected under due process clause. In *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005), the Seventh

Circuit affirmed the dismissal of the plaintiff's due process claim under Rule 12(b)(6) even after he spent 90 days in disciplinary segregation. *Lekas* described the conditions in disciplinary segregation as:

> inability to participate in prison programs, inability to participate in educational programs, inability to participate in work programs and resulting loss of prison employment and wages, loss of contact visits, loss of telephone usage, inability or substantially curtailed ability to receive visits from family, inability to attend church, no visits from clergy, drastic reduction in exercise privileges and in commissary access both in terms of frequency and the types of items allowed, drastic reduction in the number and nature of personal items that prisoners are allowed to have in their possession, and no access or very little access to audio/visual items.

*Id.* at 610.

In *Marion v. Columbia Correctional Institution*, 559 F.3d 693 (7th Cir. 2009), the Seventh Circuit discussed the limited interest a prisoner has in avoiding disciplinary segregation and summarized its prior holdings on the issue. The court "noted that six months of segregation is 'not such an extreme term' and, standing alone, would not trigger due process rights." *Id.* at 698 (*quoting Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995)).

In this case, the plaintiff remained in administrative segregation for 33-34 days between court orders limiting his telephone communications. The plaintiff's continued placement in administrative segregation for just over a month, with a break from October 11 through October 14 when the plaintiff was in Milwaukee County, does not implicate a liberty interest. The standard conditions of administrative segregation at the Jail were not atypical. To the extent the plaintiff may have faced atypical conditions of confinement, they were isolated incidents that are addressed in separate claims in this action and did not last longer than a couple of days. The plaintiff had no protected

liberty interest, and the defendants are entitled to summary judgment on the plaintiff's due process claim.

### 3.2    Conditions of Confinement: Recreation

The court allowed the plaintiff to proceed on a claim that he was deprived of recreation during his entire time at the Jail.

The defendants argue that there is no evidence that the plaintiff suffered objective, sufficiently-serious injuries due to lack of recreation or that his health was threatened. The plaintiff made no medical requests regarding lack of exercise. The defendants point out that the plaintiff was not at the Jail continuously during this time period; he was transferred to Milwaukee County on several occasions for a few days each time. The defendants also highlight the Jail's explicit recreation policy, which addresses active and passive recreation and even suggests the types of exercises inmates might do in their cells and dayrooms.

A deprivation of out-of-cell exercise might be cruel and unusual punishment if physical or psychological problems arise as a consequence. *Delaney v. DeTella,* 256 F.3d 679, 683-84 (7th Cir. 2001). The plaintiff asserts that the lack of recreation opportunities caused him to suffer severe muscle and joint pain and stiffness and emotional distress, but he has presented no evidence tracing these conditions to the restrictions on his exercise. Defendants are, therefore, entitled to summary judgment on this claim.

### 3.3    Cruel and Unusual Punishment and Failure to Provide Medical Treatment: The September 21 Incident

The plaintiff's claims against defendant Ellenberger relate to the September 21 incident. The parties do not agree on the details of the incident. However, there is a video of the incident from the surveillance camera in the dayroom, which the court has reviewed and will rely on as a correct

representation of the events. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

On the video, the plaintiff can be seen crouching down near the opening in the door from the dayroom into the corridor and talking to someone through the door. He takes a piece of paper and puts it and his hand and arm through the opening in the door. At approximately 5:00 on the video, the plaintiff's hand comes back, with a brief view of another arm. The plaintiff is pushed back from a crouching position to sitting on his bottom. He puts his hands out behind him to stabilize himself. The whole incident is over by 5:02 on the video. At 5:03, the plaintiff sits forward, collects his papers, and gets up. He briefly rubs his elbow, but at no time did he hit his head. Although the plaintiff's face was near the opening in the door, the video clearly shows that Ellenberger only made contact with the plaintiff's arm, not his face.

Because the plaintiff was a pretrial detainee in the Jail at the time of this incident, the plaintiff's claim falls under the Due Process Clause of the Fourteenth Amendment. *Forrest v. Prine*, 620 F.3d 739, 743-44 (7th Cir. 2010); *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). "The Fourteenth Amendment right to due process provides at least as much, and probably more, protection against punishment as does the Eighth Amendment's ban on cruel and unusual punishment." *Forrest*, 620 F.3d at 744 (citations omitted).

> Several factors are relevant in determining whether a defendant applied force in good faith or for purposes of causing harm, including the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of the injury caused by the force.

*Lewis*, 581 F.3d at 477.

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson, v. McMillian*, 503 U.S. 1, 9-10 (1992) (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.3d 1028, 1033 (2d Cir. 1973); *Hudson,* 503 U.S. at 9. This is just that sort of push or shove, and it did not violate the plaintiff's Fourteenth Amendment rights.

Plaintiff also claims that Ellenberger failed to provide medical attention following the September 21 incident. To prevail on this claim, plaintiff will have to prove that Ellenberger acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825 (1994). However, following the incident, Ellenberger referred the plaintiff to the nurse for treatment and plaintiff received treatment; this is not deliberate indifference.

For these reasons, the court concludes that Ellenberger is entitled to summary judgment on both claims arising out of the September 21 incident.

3.4     Conditions of Confinement: Unhygienic Conditions

Jail records show that a neighboring inmate threw feces and urine into the plaintiff's cell on October 5, 2010. The court allowed the plaintiff to

proceed on conditions of confinement claims against defendants Latham and Ramos due to their refusal to allow the plaintiff to clean his cell and their failure to provide the plaintiff with a clean blanket.

According to the defendants, Jail staff addressed and corrected the condition of the plaintiff's cell by issuing the plaintiff new jail items and cleaning his cell the same day. In contrast, the plaintiff avers that he was told that he would get a change of clean clothes, but they were never given to him. He also swears that he was denied clean linens and his cell was not cleaned. This factual dispute precludes summary judgment on this claim.

Moreover, "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (citations omitted). In *Johnson*, 891 F.2d at 139, the Seventh Circuit determined that three days in a cell with feces smeared on walls was not within "civilized standards, humanity, and decency." Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that even twenty-four hours in a cell smeared with another inmate's feces violated the plaintiff's constitutional rights. Thus, summary judgment on this claim will be denied.

3.5    Conditions of Confinement: Deprivation of Water

The court allowed the plaintiff to proceed on a claim against defendant Jacobson for cutting off the water in the plaintiff's cell from October 4, 2010, through October 6, 2010. However, the defendants have submitted evidence that it was defendant Koldeway who turned off the water to the plaintiff's cell. This claim will be considered as to defendant Koldeway.

The defendants submit that the water was turned off to cells 6, 7, and 8 while staff searched each cell and removed containers that could hold liquid to prevent further incidents. The Jail records are not clear with regard to this incident, but staff generally would have kept the water turned off in each cell temporarily to prevent further similar incidents. The defendants maintain that inmates in cells 6, 7, and 8, including the plaintiff, would have been permitted to flush their toilets and take water to drink at least once per day until the water restriction was removed. Yet plaintiff avers that his water was not turned back on until October 6, 2010, and that he was not permitted to flush his toilet or take water to drink until October 6, 2010.

"Clearly, prison officials have a responsibility to provide inmates with a minima of shelter, sanitation and utilities-basic necessities of civilized life." *Johnson v. Pelker*, 891 F.2d.136, 139 (7th Cir. 2010). There is a genuine issue of material fact regarding whether the plaintiff had access to any water for three days. This factual dispute precludes summary judgment on this claim.

### 3.6    Deprivation of Property

The plaintiff was allowed to proceed on claims against CERT members, defendants Emper, Koldeway, and Scherff, regarding alleged actions on October 15, 2010. The plaintiff asserted in his second amended complaint that the CERT confiscated his property, including sheets, blankets, legal papers, hygiene items, reading/writing materials, and drinking cup. However, Jail records do not reflect any CERT intervention involving the plaintiff on or about October 15, 2010. The plaintiff does not address this claim in his response to the defendants' motion for summary judgment. It will be deemed abandoned, *see Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003), and defendants will be awarded summary judgment on this claim.

3.7    Failure to Provide Medical Treatment: October 24, 2010

The plaintiff was allowed to proceed on a claim against defendant Koldeway regarding the use of chemical spray on October 24, 2010, and the subsequent denial of medical care. However, Jail records do not reflect an incident on or about October 24, 2010, during which the plaintiff was either directly or indirectly exposed to OC Spray or any other chemical agent. Additionally, the plaintiff's jail records do not reflect any request for medical treatment on or about October 24, 2010, related to exposure to OC Spray or any other chemical agent. The plaintiff did not dispute these proposed findings of fact, which "constitutes an admission…that there are no disputed issues of genuine fact warranting a trial" on this claim. *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995). Accordingly, defendant Koldeway is entitled to summary judgment on this claim.

3.8    Free Exercise

Finally, the plaintiff was allowed to proceed on a First Amendment free exercise claim against defendants Carlson, Latham, Emper, Koldeway, Gonzalez, Brown, Scherff, Jacobson, Wearing, Ellenberger, and Ramos. The plaintiff asserts that the defendants denied his requests for a Quran, a Salat schedule and clock, the opportunity to fast during Ramadan, and the opportunity to participate in feast day activities.

> Prisoners retain the right to exercise their religious beliefs, although that right is not unfettered. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley*, 482 U.S. 78, 89-91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Tarpley v. Allen County, In.*, 312 F.3d 895, 898 (7th Cir.2002). Prison officials may restrict inmate's ability to practice his faith so long as the restriction is reasonably related to a legitimate penological interest. *See Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Legitimate penological interests include security and economic concerns. *Al-Alamin v. Gramley*, 926 F.2d 680, 686

Case 2:11-cv-01118-JPS   Filed 08/06/13   Page 19 of 23   Document 66

(7th Cir.1991). When officials assert such a concern to justify the curtailment of an inmate's religious exercise, we must consider four factors in determining whether the challenged restriction is constitutional: (1) whether the restriction "is rationally related to a legitimate and neutral governmental objective"; (2) "whether there are alternative means of exercising the right that remain open to the inmate"; (3) "what impact an accommodation of the asserted right will have on guards and other inmates"; and (4) "whether there are obvious alternatives to the [restriction] that show that it is an exaggerated response to [penological] concerns." *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir.2004) (citing *Turner*, 482 U.S. at 89-91, 107 S.Ct. 2254).

*Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009).

The defendants argue that the Jail has no policy prohibiting the free exercise of religion. They maintain that there is no specific information regarding any defendants denying plaintiff free exercise and that the plaintiff made no requests for a Quran or any other item related to his practice of his religion.

Yet the plaintiff avers that he wrote Wearing and Brown at least ten times requesting a Quran and other religious accommodations, but never received a response. The plaintiff has not provided copies of those letters or details about what he requested in each letter. Nor does he indicate why he did not use the inmate request system for those requests since he used it for other things. In their reply brief, the defendants acknowledge the plaintiff's statements that he wrote to Wearing and Brown ten times between August 12, 2010, and August 22, 2010, when the plaintiff was first transferred to administrative segregation. The defendants call these allegations and argue that the plaintiff provides nothing more than this assertion as evidence. But the plaintiff made this statement in his sworn declaration.

> Courts, including this one, occasionally have issued opinions
> asserting that self-serving affidavits and depositions may be
> discounted. Yet "we long ago buried—or at least tried to
> bury—the misconception that uncorroborated testimony from
> the nonmovant cannot prevent summary judgment because it
> is 'self-serving.'" *Berry v. Chicago Transit Authority*, 618 F.3d
> 688, 691 (7th Cir.2010); *see also Darchak v. Chicago Board of
> Education*, 580 F.3d 622, 631 (7th Cir. 2009); *Buie v.
> Quad/Graphics, Inc.*, 366 F.3d 496, 504–06 (7th Cir.2004); *Payne
> v. Pauley*, 337 F.3d 767, 770–73 (7th Cir.2003).

*Smith v. Schaefer*, 2013 WL 1867428 (7th Cir. 2013). An affidavit is evidence.
*Lax v. City of South Bend*, 449 F.3d 773, 774 (7th Cir. 2006).

The list of items allowed in Administrative Segregation does include
a Bible. The plaintiff cites that policy as evidence of the denial of the Quran,
but he doesn't have a specific inmate request for a Quran.

There is a factual dispute that precludes summary judgment on this
claim. The defendants insist that the plaintiff was not denied the ability to
exercise his religion, but the plaintiff avers that he requested a number of
religious accommodations and never got a response, effectively denying him
the right to practice his religion.

However, only a defendant who is personally responsible for
depriving the plaintiff of a constitutional right may be held liable under
Section 1983. *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008); *Trujillo
v. Williams*, 465 F.3d 1201, 1227 (10th Cir. 2006); *Farrell v. Burke*, 449 F.3d 470,
484 (2d Cir. 2006). If someone else has committed the act that resulted in the
constitutional deprivation, then the defendant is personally responsible, and
thus liable under § 1983, only if he knows about the other person's act, has
a realistic opportunity to prevent it, but deliberately or recklessly fails to do
so. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Smith v. Mensinger*, 293

F.3d 641, 650-51 (3d Cir. 2002); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Based on the evidence in the record, only Wearing and Brown, who the plaintiff avers received requests for religious accommodations from him, were aware of the plaintiff's unfulfilled desire to exercise his religion. The court will grant summary judgment for the remaining defendants on this claim.

4.      Conclusion

The following claims may proceed to trial: (1) a conditions of confinement claim against defendant Koldeway for cutting off the water to the plaintiff's cell on October 4, 2010, which allegedly resulted in the plaintiff not having the ability to flush his toilet or access to any water to drink until he was moved to another cell on October 6, 2010; (2) a conditions of confinement claim against defendants Latham and Ramos due to their alleged refusal to allow the plaintiff to clean his cell and their alleged failure to provide the plaintiff with a clean blanket after a neighboring inmate threw feces and urine into the plaintiff's cell; and (3) free exercise claims against defendants Wearing and Brown for their alleged failure to respond to his requests for religious accommodations, which effectively denied the plaintiff's ability to practice his religion.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #49) be and the same is hereby GRANTED in part and DENIED in part;

Case 2:11-cv-01118-JPS   Filed 08/06/13   Page 22 of 23   Document 66

IT IS FURTHER ORDERED that Sheriff Robert Carlson, C.O. Emper, Sgt. Gonzalez, Deputy Brad Allen, Sgt. Kellen Schrett, C.O. Jacobson, and Andrew Ellenberger be and same are hereby DISMISSED as defendants in this action; and

IT IS FURTHER ORDERED that a status conference will be held in Courtroom 425 of the United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, at 10:00 A.M. on September 5, 2013, to address the further scheduling of this case, including trial. The court will initiate the call to Waupun Correctional Institution for plaintiff's participation.

Dated at Milwaukee, Wisconsin, this 6th day of August, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge